**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

MALCOLM INTERNATIONAL, LLC,

     *Plaintiff,*

v.                                                                    No. 1:23-CV-00188-SMD-JMR

FISHER SAND & GRAVEL-NEW
MEXICO, INC.,

     *Defendant,*

FISHER SAND & GRAVEL-NEW
MEXICO, INC.

     *Counter-Plaintiff*,

v.

MALCOLM INTERNATIONAL, LLC,

     *Counter-Defendant*.


**OMNIBUS OPINION AND ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION
FOR DECLARATORY JUDGMENT**

     **THIS MATTER** is before the Court on Defendant Fisher Sand & Gravel's ("Fisher's")

motion for summary judgment.  Doc. 49 ("Def.'s SJ Mot.").  Plaintiff Malcolm International, LLC

("Malcolm") filed its response, and Defendant filed its reply.  Doc. 51 ("Pl.'s SJ Resp."); Doc. 52

("Def.'s Reply").

FACTUAL BACKGROUND

     This case arises from a contractual dispute between Fisher and Malcolm.  Doc. 1

("Compl.").  In March of 2018, the New Mexico Department of Transportation ("NMDOT")

selected Fisher as the primary contractor for construction of a bridge in Quay County, New

Mexico.  Compl. ¶¶ 9–10.  Fisher then subcontracted Malcolm to complete the cast-in-place piers

and other bridge components ("the Project"). *Id.* ¶ 11. Prior to the Project's start, Fisher and NMDOT concluded that raising the piers an extra five feet out of the water would make the bridge more environmentally sound. *Id.* ¶ 12. Fisher informed Malcolm of this design change and Malcolm subsequently submitted an estimate of the associated costs of redesigning the piers. *Id.* ¶¶ 16–17. In October of 2018, Fisher and NMDOT executed Change Order Six, approving the new plan and granting a forty-five-day extension to Fisher. *Id.* ¶ 19. Malcolm was not a party to the Change Order. *Id.* ¶ 14. Fisher agreed to absorb the cost of the revised design, but did not guarantee that Malcolm would be compensated for costs associated with the Project's new schedule. *Id.* ¶¶ 13, 18.

The pier redesign did not alter the scope of the work that Malcolm was hired to complete (one bridge, two abutments, two piers, and two disc bearings). *Id.* ¶ 15. It did, however, delay Malcolm's start date and increase the quantity of rebar and concrete needed to complete the piers. *Id.* Fisher paid Malcolm for the additional materials, but not for the extra labor or other costs related to the delay. *Id.* ¶ 30. Malcolm and Fisher pursued administrative remedies to recover these costs from NMDOT. *Id.* ¶ 23. NMDOT denied Malcolm's claim. *Id.* Malcolm, Fisher, and NMDOT then participated in an unsuccessful Public Works mediation. *Id.* ¶ 24. Following these efforts, Fisher did not file a summons and complaint against NMDOT on Malcolm's behalf. *Id.* ¶ 25. Malcolm asked Fisher to do so. *Id.* ¶ 26. Fisher replied that it was only willing to file on Malcolm's behalf if Malcolm agreed to release Fisher of any liability for damages. *Id.* Malcolm refused and Fisher never filed the complaint. *Id.*

PROCEDURAL BACKGROUND

Malcolm sued Fisher on March 6, 2023, in the United States District Court for the District of New Mexico, invoking the court's diversity jurisdiction. Compl. at 1. *See* 28 U.S.C. § 1332.

The complaint alleges three counts: breach of contract, unjust enrichment, and breach of the duty of good faith and fair dealing. *Id.* at 4–6. In April of 2023, Fisher moved to dismiss all three claims. Doc. 5 ("Def.'s Mot. to Dismiss."). The court dismissed Malcolm's claims for unjust enrichment and breach of the duty of good faith and fair dealing. Doc. 13 ("Order on Def.'s Mot. to Dismiss") at 7. The remaining claim for breach of contract was permitted to proceed on either of two theories: that Fisher breached the contract by failing to preserve Malcolm's claim against NMDOT for compensation or that Fisher breached by failing to compensate Malcolm for increased costs that Malcolm suffered because of delays in the project. *Id.* at 7–8. The Parties proceeded with discovery. Doc. 40. Fisher now seeks summary judgment on Malcolm's breach of contract claim and brings a crossclaim for declaratory judgment, requesting that the Court award Fisher costs and attorneys' fees associated with the litigation. Def.'s SJ Mot. at 13.

LEGAL STANDARD

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Butler v. Daimler Trucks N. Am., LLC*, 74 F.4th 1131, 1140 (10th Cir. 2023). The moving party bears the burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once this requirement is met, the non-movant can defeat summary judgment by showing that there is a genuine dispute of material facts. *Id.* The non-movant's response must "set forth specific facts by reference to affidavits, deposition transcripts, or other exhibits to support the claim." *Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146, 1151 (10th Cir. 2006). The court then reviews the proffered evidence and, drawing all reasonable inferences in favor of the nonmoving party, determines whether the facts "establish, at a minimum,

an inference of the presence of each element essential to the case." *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001).

DISCUSSION

**A. Undisputed Material Facts**

The Court begins with the Parties' statements of undisputed material facts ("UMFs") and construes any disputed fact in the light most favorable to Malcolm as the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).  Local Rule 56.1 instructs that each disputed fact "must be numbered, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed."  D.N.M.LR-Civ. 56.1(b). If the non-movant fails to controvert a material fact with a citation to the record, it is deemed undisputed. *Id.*; *see, e.g.*, *Martin v. City of Albuquerque*, 147 F. Supp. 3d 1298, 1336 n.3 (D.N.M. 2015).

Malcolm's statement of materials facts does not comply with the Local Rules; its response to Fisher's UMF is unnumbered, at times lacking citation to the record, and its additional material facts, which should be lettered, are instead numbered.  Pl.'s SJ Resp. at 3–6 ("Pl.'s UMF"). However, because these errors are largely issues of formatting, the Court will consider the facts properly disputed where Malcolm has included citations to the record.  *Cf. Skowron v. C.H. Robinson Co.*, 651 F. Supp. 3d 401, 404 (D. Mass. 2023) (finding facts properly disputed, even where they did not comply with local rules, because the plaintiff include citations to the record). The following recitation of facts thus draws from Fisher's initial UMF, Malcolm's response, and

Fisher's reply. [1]  Def.'s SJ Mot. at 5–9 ("Def.'s UMF"); Pl.'s UMF at 3–6; Def.'s Reply at 2–4 ("Def.'s Resp. to Pl.'s UMF").

On January 11, 2018, Fisher entered into a subcontract with Malcolm for the Project.  Def.'s UMF ¶ 1; Pl.'s UMF at 3; Def.'s SJ Mot., Ex. A ("the Contract") at 1.  Two months later, Fisher submitted a request to NMDOT to redesign the pier footings to make them more structurally sound. Def.'s UMF ¶ 2; Pl.'s UMF at 2.  Fisher informed Malcolm of the need to raise the piers and Malcolm understood that this alteration would delay its start date. [2]  Def.'s UMF ¶ 3; Pl.'s UMF ¶ 3.  Fisher and NMDOT then executed Change Order Six to ratify the design change.  Def.'s UMF ¶ 10; Pl.'s UMF at 3.  Malcolm did not sign the Change Order.  Pl.'s UMF ¶ A.; Def.'s Resp. to Pl.'s UMF ¶ A.  In Fisher's original contract with NMDOT, the company had agreed to cover "any additional costs" resulting from a design alteration.  Def.'s UMF ¶ 11; Pl.'s UMF at 3.  Change Order 6 amended that language to limit Fisher's liability to the "costs for an environmentally safer project, enhanced constructability of the footings, and a safer work area for the employees."  Def.'s UMF ¶ 11; Pl.'s UMF at 3.  Malcolm and Fisher did not amend their original subcontract to reflect the design change and did not execute a written agreement obligating Fisher to pay Malcolm for delay costs.  Def.'s UMF ¶ 7; Pl.'s UMF ¶ 7.[3]

---

[1] The paragraph citations to Malcolm's UMF are derived from Fisher's numbered version.  Where Malcolm has combined its response to multiple UMFs into one sentence, the Court cites to the page number.  Malcolm's additional UMF will be cited to as though they had been correctly lettered rather than numbered (1=A, 2=B, 3=C).

[2] Malcolm does not effectively dispute when it first learned of the "nature and extent of cost and time impacts" from the design change.  Pl.'s UMF ¶ 3.  Though Malcolm disagrees with Fisher's interpretation of various deposition transcripts, Malcolm's response lacks any record citations to contradict Fisher's conclusion.  *Id.*  Fisher's interpretation is therefore treated as undisputed.  *Coleman v. Blue Cross Blue Shield of Kan., Inc.*, 287 F. App'x 631, 634 (10th Cir. 2008) (affirming district court's decision to find all facts admitted if they were not "controverted by a readily identifiable portion of the record").

[3] Malcolm "disputes" this fact.  Pl.'s UMF ¶ 7.  Despite agreeing that "there was no written modification to the subcontract," Plaintiff then explains why other sections of the contract supports its claim for additional compensation.  *Id.*  Whether the contract's terms entitle Malcolm to compensation is a legal, not factual, dispute and Malcolm's statement as to the law does not receive any favorable interpretation from the Court.  *See Glassock v. McCotter*, 56 F. App'x 452, 453 (10th Cir. 2003).

Malcolm completed the Project without a change order from Fisher.  Pl.'s UMF ¶ B; Def.'s Resp. to Pl.'s UMF ¶ B.  The redesign did not alter the work assigned to Malcolm—two disc bearings, two piers, two abutments, and one bridge—but impacted the quantities of rebar and concrete needed, the Project's duration, the cost of performance, and the conditions under which work had to be performed.  Def.'s UMF ¶¶ 8, 9; Pl.'s UMF ¶¶ 8, C.[4]  Fisher compensated Malcolm for the increase in materials.  Def.'s UMF ¶ 9; Pl.'s UMF at 3.  Malcolm then submitted a compensation claim to NMDOT for other attendant costs.  Def.'s UMF ¶ 14; Pl.'s UMF at 3. NMDOT denied the claim due to procedural errors.  Def.'s UMF ¶ 15; Pl.'s UMF at 3.  The Change Order had no impact on Malcolm's compensation claim and was not the basis for its denial.  Def.'s UMF ¶ 16; Pl.'s UMF at 3.

### B.  The Parties' Arguments

Originally, Malcolm alleged breach of contract based on Fisher's failure to adequately represent its claims for compensation before NMDOT and failure to compensate it for the increased cost of performance.  Compl. ¶ 30.  Malcolm appears to have abandoned the first theory; it briefly references this claim, but provides no relevant facts.  Pl.'s SJ Resp. at 9.  Malcolm simply ends its one-sentence argument with the assertion that Fisher's representation is "another genuine fact issue precluding summary judgment."  *Id.*  The statement that Fisher's representation is inherently a "fact issue" cannot defeat a motion for summary judgment.  *Parker v. Town of Chelsea*, 275 F. App'x 769, 773 (10th Cir. 2008) ("Conclusory statements are insufficient to overcome defendants' motion for summary judgment."); *Presbyterian Healthcare Servs. v. Factory Mut. Ins.*

---

[4] Malcolm and Fisher disagree over whether the design change altered the scope of Malcolm's work.  Though both Parties acknowledge that Malcolm required more rebar and concrete than initially expected, Fisher characterizes that modification as a change in unit quantities rather than in the work Malcolm was hired to perform.  Def.'s UMF ¶ 8.  Malcolm does not offer any evidence to controvert the fact that the final product it was hired to construct changed but digresses into other costs that the delay caused.  Pl.'s UMF ¶ 8.  The Court thus adopts a narrow definition of "scope of work" and means only that Malcolm's expected output was unchanged.

*Co.*, 512 F. Supp. 1169, 1175 (D.N.M. 2021) ("[T]o defeat summary judgment, the nonmovant must articulate a viable legal theory."). The Court therefore grants summary judgment to Fisher on Malcolm's claim that Fisher's failure to file a complaint against NMDOT breached the Contract.

What remains is Malcolm's theory that Fisher's inadequate reimbursement of its costs constituted a breach of Article 10 of the Contract. Pl.'s SJ Resp. at 6–7. Fisher responds that Article 10 is not only inapplicable to Malcolm's claim for damages, but that Article 2 bars recovery entirely. Def.'s SJ Mot. at 11–12. The Court addresses each article in turn.

### 1. Article 10

Article 10 of the Contract is a "changes clause" and reads as follows:

> The Contractor or the Owner may at any time by written order and without notice to the Subcontractor's sureties, make changes in, additions to or omissions from the work to be performed under this Subcontract. The Subcontractor shall promptly proceed with the performance of this Subcontract as so changed. If the change is for work not itemized on Schedule C, any increase or decrease in the Subcontract price resulting from such changes shall be agreed upon in writing by the parties hereto prior to the performance of the work. Any changes in quantities itemized on Schedule C shall cause an adjustment in Subcontract price at the unit prices set forth on that Schedule. The Contractor will pay for extra work performed and materials furnished by the Subcontractor.

Contract at 3. Article 10 intersects with Schedule C of the Contract, which enumerates the quantity, per item price, and total price of materials for the Project. Compl., Ex. 1 at 5 ("Schedule C"). Article 10 splits compensation for changed work into two categories: work within Schedule C and work outside of Schedule C. Contract at 3. If the work is not itemized in Schedule C, then the Parties must agree to any increase or decrease in price resulting from the change in writing. *Id.* If the work is included in Schedule C, the total price will be adjusted based on the unit price set forth there. *Id.*

Malcolm argues that Fisher changed Malcolm's work "both by redesigning the pier footings and by modifying the preliminary schedule on which Malcolm's bid had been based."

Pl.'s SJ Resp. at 6. The Parties agree that Fisher paid Malcolm for the increase in Schedule C materials—namely, rebar and concrete units. Def.'s UMF ¶ 9; Pl.'s UMF at 3; *see* Schedule C. However, Malcolm insists that Article 10's final sentence obligates Fisher to pay for "extra work performed and materials furnished," regardless of whether there was a written order in place or the items are found in Schedule C. Pl.'s SJ Resp. at 7. Accordingly, Malcolm is entitled to "additional costs due to delay or due to performance of the work in adverse weather." Pl.'s SJ Resp. at 7.

Fisher responds that Malcolm cannot recover under Article 10 because Malcolm pursues damages that fall outside of Schedule C and are therefore subject to the "written order" requirement. Def.'s SJ Mot. at 12. Because Malcolm has not identified a "written order" between the Parties, its claim fails. *Id.* Fisher also disagrees with Malcolm's interpretation of Article 10's concluding sentence. Def.'s Reply at 6. Fisher contends that its duty to pay for extra work and materials furnished is limited to the two scenarios described earlier in Article 10's text. On Fisher's reading, Article 10 does not create an "unlimited circumstance under which additional compensation can be paid." *Id.* Instead, it specifies that that the Contractor will pay for extra work and materials furnished when there is a written order for non-Schedule C item or there is a written order. Moreover, even if the Court interpreted Article 10's final sentence as entitling Malcolm to damages for all "extra work and materials furnished," Fisher believes that Malcolm's claim seeks to recover delay costs, not extra work, and is therefore outside of Article 10. *Id.* at 5.

## 2. Article 2

On the premise that Malcolm's costs are delay costs, Fisher asserts that Article 2 of the Contract precludes relief. Def.'s SJ Mot. at 11. Article 2, often referred to in construction contracts

as a "no-damages-for-delay" clause,[5] limits Fisher's liability for delays in the Project. As originally drafted, Article 2 read:

> No claims shall be asserted by Subcontractor against Contractor or Owner for delays they may cause in the Subcontractor's work. Subcontractor shall not be entitled to any extra compensation from Contractor for any suspension, delay, or acceleration, regardless of who is responsible for same, unless specifically agreed to in writing by the Contractor.

*Id.* During negotiations, the Parties removed the first sentence. Pl.'s SJ Resp. at 9. Thus, as signed, the Contract permits Malcolm to assert claims against Fisher for delays, but prohibits "extra compensation" without a written agreement. *Id.*

Fisher argues that (1) all of the Malcolm's alleged costs are "delay costs" and (2) Article 2 bars recovery because Malcolm has not produced evidence of a written agreement. Def.'s SJ Mot. at 11. Malcolm concedes that the Contract "leaves the exception to the original bar on delay damages, namely where Fisher agreed in writing," but interprets this language as "allowing compensation when Fisher acknowledges having changed the schedule and/or design." Pl.'s SJ Resp. at 8–9. Malcolm then shifts to arguing that, even if a written agreement is typically required, Fisher administered the contract in a way that indicated written modifications were unnecessary. Pl.'s SJ Resp. at 10. In particular, Malcolm contends that because Fisher authorized and paid for pier design change without a change order, Article 2's written agreement requirement was likewise waived. *Id.* Malcolm then accuses Fisher of relying on the lack of written agreement as a "legal pretext for avoiding its promise to pay Malcolm for costs arising from damages" and urges that Fisher should be estopped from using this defense to shield itself from liability. *Id.*

---

[5] No-damages-for-delay clauses shield contractors from suits arising from changes in the construction project's schedule. The New Mexico Supreme Court has not addressed their enforceability, but they are widely accepted in other jurisdictions. *See, e.g.*, *Port Chester Elec. Constr. Corp., v. HBE Corp.*, 894 F.3d 47, 48 (2d Cir. 1990); *United States ex rel. Pertun Constr. Co. v. Harvesters Grp., Inc.*, 918 F.2d 915, 919 (11th Cir. 1990); *PYCA Indus., Inc. v. Harrison Cnty. Waste Water Mgmt. Dist.*, 177 F.3d 351, 362 (5th Cir. 1999).

Alternatively, Malcolm asks the Court to recognize an exception to Article 2 for unanticipated delays. *Id.* at 11. Malcolm acknowledges that the New Mexico Supreme Court has never recognized an "unforeseen" delay exemption to no-damages-for-delay clauses, but advocates for its use here because the design change "was not contemplated by Fisher or Malcolm when they entered into the subcontract." *Id.* If the Court does adopt this exemption, Malcolm argues that summary judgment is improper because the "reasonable scope of the parties' contemplation" is "inherently a fact based issue." *Id.*

### C. Analysis

Because this case is before the Court on diversity jurisdiction, and the Contract was made and executed in New Mexico, New Mexico law governs Malcolm's claim for breach of contract. *Sakar v. Hartford Ins. Co. of the Midwest*, CV 12-0861, 2013 WL 2013 12085168, at *3 (D.N.M. Jul. 12, 2013) ("In New Mexico, courts will apply the law of the state where the contract was made or executed."); *cf. Madsen v. Prudential Fed. Sav. & Loan Ass'n*, 635 F.2d 797, 802 (10th Cir. 1980) ("[T]he interpretation and enforcement of contracts are traditionally within the province of state courts."). If the New Mexico Supreme Court has not addressed an issue raised in this case, the Court's responsibility is to predict how it would rule. *Wade v. EMASCO Ins. Co.*, 483 F.3d 657, 666 (10th Cir. 2007). "In doing so, it may seek guidance from decisions rendered by lower courts in the relevant state, appellate decisions in other states with similar legal principles district court decisions interpreting the law of the state in question, and the general weight and trend of authority in the relevant area of law." *Id.* (internal citations and quotations omitted).

A plaintiff claiming breach of contract has the burden of proving the existence of the contract, breach of the contract, causation, and damages. *Cent. Mkt., Ltd. v. Multi-Concept Hosp., LLC*, 508 P.3d 924, 935 (N.M. Ct. App. 2022). Fisher only challenges the existence of a breach,

and the Court accordingly narrows its review to that issue.  A breach occurs when a party fails to perform a duty imposed by an agreement.  *Sanders v. FedEx Ground Package Sys., Inc.*, 18 P.3d 1200, 1208 (N.M. 2008); *Kreischer v. Armijo*, 884 P.2d 827, 829 (N.M. Ct. App. 1994).  Thus, to defeat Fisher's motion, Malcolm must establish a contractual duty and highlight facts that create a genuine dispute as to whether Fisher breached that duty.

### 1.  Malcolm's Claims Are for Delay Damages and Not for Extra Work.

Before addressing whether Malcolm is entitled to damages under the Contract, the Court answers the question of whether Malcom seeks compensation for "delay" costs or "extra work" costs to determine if Article 10 applies.  "Extra work" refers to tasks "not contemplated by the contract." *McKinney Drilling Co. v. Collins Co.*, 701 F.2d 132, 136 (11th Cir. 1983); *Brant Constr. Co. v. Metro. Water Reclamation Dist. of Greater Chi.*, 967 F.2d 244, 248 (7th Cir. 1992) ("The extra work doctrine affords compensation for work that was not within the scope of the contract[.]"); *S. Erectors, Inc. v. City of New York*, No. 90-CIV-5651, 1992 WL 162743, at *3 (S.D.N.Y. June 19, 1992) (defining extra work as when a subcontractor is required to "perform tasks not included in or anticipated under the contract"); *see, e.g.*, *Taylor v. Allegretto*, 816 P.2d 479, 483 (N.M. 1991) (characterizing construction of a building's shell as "additional work," which was not included in the contract, where the contract defined "work" as the construction of one unit and not the entire building).  The New Mexico Supreme Court has enforced construction contracts requiring written authorization for extra work.  *State ex rel. Santa Fe Sand & Gravel Co., Pecos Constr. Co.*, 519 P.2d 294, 297–98 (N.M. 1974) (finding that subcontractor was unable to recover for extra work because the subcontractor had to "obtain written authorization" for such compensation "which was never secured").

Malcolm disputes Fisher's statement that the pier redesign "did not alter the amount of work Malcolm was performing."  Def.'s UMF ¶ 8; Pl.'s UMF ¶ 8.  Malcolm avers that Fisher contradicts itself by admitting that the design change "altered the quantities of work required."  Pl.'s UMF ¶ 8.  Though the phrase "quantities of work" appears to be a synonym for "extra work," the next sentence reveals that what Malcolm is referring to is the change in "unit quantities," meaning raw materials.  Those additional units, however, offer no basis for relief because Fisher already paid Malcolm for them.  Def.'s UMF ¶ 9; Pl.'s UMF at 3; *cf. Benavidez Constr. LLC v. Lewicki*, No. A-1-CA-40135, 2024 WL 1550490, at *4–5 (N.M. Ct. App. Apr. 10, 2024) (affirming trial court's decision to compensate contractor for additional materials needed to increase height of rock wall).

Beyond the pier redesign, Malcolm has not identified other "tasks" Fisher required it to complete.  Its response simply declares that "Fisher changed Malcolm's work by redesigning the pier footings and by modifying the preliminary schedule."  Pl.'s SJ Resp. at 6.  Malcolm makes no effort to rebut the testimony of its own vice president, Vince Castro, that, following the design change, Malcolm was still only contracted for two disc bearings, two piers, two abutments, and one bridge.  Def.'s SJ Mot., Ex. C ("Castro Dep.") at 54:1–10.  Though Malcolm may be correct that the pier redesign changed the Project's duration, cost of performance, and conditions under which the work was performed, these costs are not found in Schedule C and would require a written order for compensation.  *Pecos*, 519 P.2d at 297–98.  Malcolm has not shown evidence of any written orders.  Pl.'s SJ Resp. at 7.

Even presuming that the design change altered the Project's scope in some way, and that Malcolm could avoid Article 10's written authorization requirement, Malcolm's merger of its extra work costs with its delay costs dooms its claim.  Because delay costs are often difficult to

distinguish from extra work or other costs, the subcontractor must specify the source of its costs to circumvent a no-damages-for-delay clause. *Edward E. Gillen Co. v. City of Lake Forest*, 3 F.3d 192, 195 (7th Cir. 1993) (affirming grant of summary judgment on claim of delay damages where plaintiff "made no effort to identify particular costs that did not belong to the rubric of delay damages"); *Nat. Constr., Inc. v. C & C Rehab & Constr., Inc.*, 256 F. Supp. 2d 350, 355 (E.D. Pa. 2003) (granting summary judgment where subcontractor "failed to distinguish losses suffered as a result of delays by [contractor] from losses that it might suffered because of [subcontractor's] own performance problems, weather, unsuitable soils, or the existence of asbestos at the site").

Malcolm's sole attempt at separating the two is to argue that there was a "scope change" "due to performance of the work in adverse weather." Pl.'s SJ Resp. at 7. Of course, the reason that Malcolm had to work in adverse weather was that the delayed start date pushed the Project into the winter months. Castro Dep. at 8:3–9:23.[6] Working in adverse weather is also not a form of "extra work." In fact, Malcolm's response states that it is entitled to compensation for "additional costs *due to delay* or due to performance of the work in adverse weather." Pl.'s Resp. at 6 (emphasis added). Malcolm cannot rest its request for relief on the unadorned statement that some costs were unrelated to delay; it must "identify evidence supporting its conclusory assertion that some of its damages were unrelated to delay." *Gillen*, 3 F.3d at 195; *S. Erectors*, 1992 WL 162743, at *3 (finding that subcontractor's claim was for delay damages, not extra work, because "nothing in the record indicate[d] that the actual work performed by [the subcontractor] was altered in any way"). The Court therefore finds that the damages Malcolm seeks are delay damages and that Malcolm cannot recover under Article 10, no matter how broadly it is interpreted, because

---

[6] During his deposition, Castro agreed that "because of the delay in the critical path, Malcolm was unable to start its scope of work until August of 2018 rather than March of 2018 as planned." Castro Dep. at 8:3–9:23. He later affirmed that "[w]hat the design change did is pushed out the start date of Malcolm's work, which Malcolm contends caused it to incur a whole bunch of extra costs that it didn't plan for[.]" Castro Dep. 70:5–14.

there is no claim for "extra work." *Cf. United States v. Turner Constr. Co.*, 946 F.3d 201, 209 (4th Cir. 2019) (affirming district court's finding that no damages for delay clause barred recovery for cost of "storage, cleaning, loading, and shipping of panels during the time its work was delayed"); *Smith v. Philips Pipe Line Co.*, 128 F. Supp. 61, 65 (N.D. Okla. 1955) ("The Court also fails to find merit in plaintiffs' alternative contention under their second cause of action that the work in question, being performed in unseasonably bad weather, constituted 'extra work' under the terms of the written agreement.").

### 2. Article 2 Precludes Malcolm's Damages for Delay Costs.

Given that Malcolm is seeking delay damages, the Court must consider Fisher's argument that Article 2 bars Malcolm's claims. Def.'s SJ Mot. at 11. The Court begins with Article 10's plain language and asks whether its terms are ambiguous. *Bankert v. 10 Roads Express, LLC*, ___ P.3d ___, 2025 WL 892720, at *5 (N.M. Ct. App. Mar. 17, 2025). Ambiguity arises where a contract is "reasonably and fairly susceptible of different constructions." *Mark V, Inc. v. Mellekas*, 845 P.2d 1232, 1235 (N.M. 1993). To conduct this analysis, the Court must look beyond the Contract's four corners and construe the document as a whole, including the circumstances of its negotiation. *Medina v. Sunstate Realty, Inc*, 889 P.2d 171, 173 (N.M. 1995) (quoting *Mellekas*, 845 P.2d at 1235). If a contract's language is ambiguous, the meaning "must be resolved by the appropriate fact finder." *Id.* If the language is clear, then the plain meaning is "conclusive," and the court will enforce the contract as written. *ConocoPhilips Co. v. Lyons*, 299 P.3d 844, 852 (N.M. 2012); *Nearburg v. Yates Petroleum Corp.*, 943 P.2d 560, 571 (N.M. Ct. App. 1997).

### a. Article 2 Requires Written Authorization for the Contractor to be Liable for Delay Damages.

Article 2 states that Malcolm is not "entitled to any extra compensation from Contractor for any suspension, delay, or acceleration . . . unless specifically agreed to in writing." Contract at

1.  Malcolm concedes that Article 2 requires a written agreement for the subcontractor to recover delay costs and that the Parties did not execute one.  Def.'s UMF ¶¶ 6–7; Pl.'s UMF at 3. Malcolm's suggestion that Article 2 permits extra compensation where the contractor "acknowledges having changed the schedule and/or design" has no textual foundation; Article 2 does not condition compensation on a particular schedule, mention payment for design changes, or offer alternative methods for recovery outside of written agreement.  Disagreement over interpretation is not the same as ambiguity.  *Constr. Contracting & Mgmt., Inc. v. McConnell*, 815 P.2d 1161, 1164 (N.M. 1991) (reiterating that "[t]he mere fact that the parties are in disagreement on construction to be given to the contract does not necessarily establish an ambiguity" (quoting *Levenson v. Mobley*, 744 P.2d 174, 176 (N.M. 1987)).  Given Article 2's clear language, and the lack of disagreement over the written agreement requirement, the Court finds the written agreement requirement to be unambiguous and controlling.  *Espinosa v. United of Omaha Life Ins. Co.*, 137 P.3d 631, 639 (N.M. 2006) ("When a contract or agreement is unambiguous, we interpret the meaning of the document and the intent of the parties according to the clear language of the document, and we enforce the contract or agreement as written."); *see, e.g.*, *Kirkpatrick v. Introspect Healthcare Corp.*, 845 P.2d 800, 805 (N.M. 1992) (declining to adopt a "strained" interpretation of a contract that would "ignore the [contract']s express terms"); *cf. Pecos Constr.*, 519 P.2d at 298 (enforcing contract's requirement that compensation for extra work be obtained through written authorization).

### b.  The Parties' Did Not Modify Article 2's Written Agreement Requirement Through Their Conduct.

In the absence of a written agreement, Malcolm attempts to argue that the Fisher waived Article 2's written agreement requirement through its conduct.  In New Mexico, a party's conduct or statements may amend a contract, even where the contract states that all modifications must be

in writing. *Medina*, 889 P.2d at 174 ("The parties to a written contract may modify that contract by express or implied agreement as shown by their words and conduct."); *Wendell v. Foley*, 594 P.2d 750, 754 (N.M. Ct. App. 1979) ("[E]ven though the contract required all modifications to be in writing, it is the general rule that, in the absence of a prohibiting statute, a written contract may be orally modified by the parties who made the original agreement[.]"). The party asserting a modification must provide "clear and convincing evidence" to overcome a written agreement requirement. *Cent. Mkt., Ltd. v. Multi-Concept Hosp., LLC*, 508 P.3d 924, 934 (N.M. Ct. App. 2022); *Powers v. Miller*, 984 P.2d 177, 180 (N.M. Ct. App. 1999) (explaining that requiring clear and convincing evidence of oral modification balances "the principles of freedom of contract against the sanctity of written contracts").

Malcolm has failed to present "a clear statement, oral or written, or clear conduct, indicating an intent" to modify Article 2. What Malcolm cites to is the general proposition that "Fisher during the course of the project did not require written agreements modifying Malcolm's subcontract." Pl.'s SJ Resp. at 10. Specifically, Fisher changed the design of the piers without Malcolm signing a change order. *Id.*; Def.'s UMF ¶ 2. Malcolm then makes the inferential leap that, because these design alterations occurred absent a written order, Fisher's administration of the contract suggested that written modifications were no longer necessary for any of the provisions. Pl.'s SJ Resp. at 10. Even accepting arguendo, that Fisher modified Article 10 without written authorization, this conduct does not translate into a modification of Article 2. Malcolm has not included a single piece of evidence, much less clear and convincing evidence, waiving Article 2's written agreement requirement. Malcolm posits that "fact testimony will show" the Parties' intent to modify the contract. *Id.* At this stage, Malcolm cannot rely on the specter of future evidence to support its claim; it must provide that evidence. *Conaway v. Smith*, 853 F.2d

789, 794 (10th Cir. 1988) (explaining that a party "may not escape summary judgment in the mere hope that something will turn up at trial). The Court will not "search the record" for "dormant evidence" to the contrary and thus concludes that there is no genuine dispute over whether Article 2 was modified. *Chavez v. New Mexico*, 397 F.3d 826, 839 (10th Cir. 2005); *Turpin v. Smedinghoff*, 874 P.2d 1262, 1263 (N.M. 1994).

The Court also finds what appears to be a claim for promissory estoppel based on Fisher's conduct unconvincing.[7] The elements of promissory estoppel are as follows:

> (1) an actual promise must have been made which in fact induced the promisee's action or forbearance; (2) the promisee's reliance on the promise must have been reasonable; (3) the promisee's action or forbearance must have amounted to a substantial change in position; (4) the promisee's action or forbearance must have been actually foreseen or reasonably foreseeable to the promisor when making the promise; and (5) enforcement of the promise is required to prevent injustice.

*Strata Prod. Co. v. Mercury Expl. Co.*, 916 P.2d 822, 828 (N.M. 1996). For one, Malcolm does not substantiate its allegation of a "promise" with any evidence. Pl.'s SJ Resp. at 10. Looking to the record, the Court notes that Castro's deposition mentions that he was told Fisher "would get [Malcolm] something" but admits that he "didn't really entertain anything after that." Def.'s Reply ¶ A; Castro Dep. 11:5–18. This statement does not amount to an "actual promise." *Strata*, 916 P.2d at 818; *Magnolia Mountain Ltd. v. Ski Rio Partners, Ltd.*, 131 P.3d 675, 683 (N.M. Ct. App. 2005) (affirming trial court's decision that promissory estoppel was inapplicable where there was no evidence of a promise); *cf. Montoya v. N.M. Hum. Servs. Dep't*, 771 P.2d 196, 199 (N.M. Ct. App. 1989) (holding that an oral gift of real property is enforceable "if there is proof of the elements of promissory estoppel"). Even if there were a promise, Malcolm does not indicate that it

---

[7] Malcolm does not characterize its argument as one for promissory estoppel, but refers to Fisher's "promise" and asks that Fisher be "estopped" from relying on Article 2's written agreement requirement. Pl.'s SJ Resp. at 10. Construing Malcolm's pleadings in the most favorable possible light, the Court interprets Malcolm's argument as one for promissory estoppel.

reasonably relied on or substantially changed its position due to Fisher's "promise." Pl.'s SJ Resp. at 10; *cf. Chavez v. Manville Products Corp.*, 777 P.2d 371, 374 (N.M. 1989) ("We hold as a matter of law that it was unreasonable for Chavez to change his position in reliance on oral representations contrary to an express term of an employment contract which provided that their agreement could only be modified in writing."). As Fisher notes, there is "no evidence that Malcolm asked Fisher to pay the delay costs until years after the work was completed, and no evidence that Fisher ever said or did anything to make Malcolm believe that Malcolm had a blank check to charge Fisher for any and all costs that Malcolm might decide were connected to the delay." Def.'s Reply at 11; *see Linneman Constr., Inc. v. Montana-Dakota Utils. Co.*, 504 F.2d 1365, 1368 (8th Cir. 1974) (finding no evidence of contractor's agreement to pay subcontractor for extra work where "[n]o demand for extra compensation was made during the performance of the contract, nor until 10 months after the completion of the job"). The Court agrees with Fisher and finds that equitable estoppel is inappropriate.

### c. The "Uncontemplated Delay" Exemption Does Not Apply to Article 2.

The Court next addresses, and ultimately rejects, Malcolm's argument that its claim is exempted from Article 2 because the delays were unanticipated. The New Mexico Supreme Court has never considered no-damages-for delay clauses, nor the exceptions that Malcolm advocates for. This Court's will therefore look to precedent and relevant guidance to "predict what the state's highest court would do." *Wade*, 483 F.3d at 666.

Malcolm's contention that "[m]ost states which have grappled with [no-damages-for-delay clauses] have found that while the clauses have some enforceability they are subject to multiple exceptions," though facially true, is misleading. Pl.'s SJ Resp. at 11. The most commonly recognized exception to no-damages-for-delays clauses are related to the party's breach of the duty

18

of good faith and fair dealing.[8]  Malcolm's good faith and fair dealing claim against Fisher has already been dismissed.  *See* Order on Def.'s Mot. to Dismiss at 7.  Some states also recognize an exception where the delay "was not contemplated by the parties," but modern courts have increasingly refused to adopt it.  *Law Co. v. Mohawk Constr. & Supply Co.*, 702 F. Supp. 2d 1304, 1323 (D. Kan. 2010) ("The decisions rejecting the uncontemplated delay exception appear to be both the better-reasoned approach and the modern trend among the cases."); *J.A. Jones Constr. Co. v. Lehrer McGovern Bovis, Inc.*, 89 P.3d 1009, 1016 (Nev. 2004) ("We are persuaded that rejecting this exception [for delays not contemplated] is the better reasoned approach." (cited in Pl.'s SJ Resp. at 11)); *Williams Elec. Co. v. Metric Constructors, Inc.*, 480 S.E.2d 447, 450 (S.C. 1997) (holding that "the courts of this state do not recognize the 'delays not contemplated by the parties' exception to a no-damages clause" (cited in Pl.'s SJ Resp. at 11)); *State Highway Admin. v. Greiner Eng'g Scis., Inc.*, 577 A.2d 363, 372 (Md. Ct. App. 1990) ("The 'not contemplated by the parties' exception [to the no damages for delays clause] is not recognized by courts of this state."); *cf. Edward E. Gillen Co. v. City of Lake Forest*, No. 91 C 0183, 1992 WL 29995, at *4 (N.D. Ill. Feb. 12, 1992) (finding that no damage for delay clause protected contractor "from damages arising out of unforeseeable as well as foreseeable delays"); *Gregory & Son, Inc. v. Guenther & Sons*, 432 N.W.2d 584, 587 (Wis. 1988) (finding that a "no damage for delay clause" shows that the parties realize that some delays cannot be contemplated at the time of the drafting of the contract).  Faced with considerable precedent rejecting the unanticipated delay exception, and the fact that the New Mexico Supreme Court has never used it, the Court declines to deviate from the "general weight

---

[8] The four widely recognized exceptions to no damages for delay clauses "relate directly to and are logical extensions of the implied covenant of good faith and fair dealing." *J.A. Jones Constr. Co. v. Lehrer McGovern Bovis, Inc.*, 89 P.3d 1009, 1016 (Nev. 2004).  They are as follows: (1) willful concealment of foreseeable circumstances that impact timely performance, (2) delays so unreasonable in length as to amount to project abandonment, (3) delays caused by the other party's bad faith or fraud, and (4) delays caused by the other party's active interference.  *Id.*

and trend of authority" and adopt this exemption.  *MidAmerica Constr. Mgmt., Inc. v. MasTec N.*
*Am., Inc.*, 436 F.3d 1257, 1262 (10th Cir. 2006).

To review, Malcolm concedes that Article 2 requires the subcontractor to obtain written
agreement to recover delay damages, that there was no written agreement, and that Fisher
compensated Malcolm in full for the changed quantities in materials.  Def.'s UMF ¶¶ 6, 7, 9; Pl.'s
UMF at 3.  Malcolm has not presented any evidence of costs unrelated to the Project's delay nor
evidence of conduct-based modification.  The Court therefore grants Fisher's motion for summary
judgment on Malcolm's claim for breach of contract.

### D.  The Court Denies Fisher's Motion for Declaratory Judgment.

Lastly, the Court addresses Fisher's claim for declaratory judgment.  Unlike Malcolm's
contract claims, Fisher's counterclaim for declaratory judgment is governed by federal law.  *Miller*
*v. Cincinnati Ins. Co.*, 323 F. Supp. 3d 1253, 1256 (D.N.M. 2018).  The Declaratory Judgment Act
provides that courts "may declare the rights and other legal relations of any interested party seeking
such declaration."  28 U.S.C. § 2201(a).  "A declaratory judgment is meant to define the legal
rights and obligations of the parties in anticipation of some future conduct, not simply to proclaim
liability for a past act."  *Marlin Oil Corp. v. Lurie*, 417 F. App'x 740, 745 (10th Cir. 2011).  Because
the Act creates a discretionary power, rather than a mandate, district courts are "entitled to consider
a number of case-specific factors in deciding whether or not to exercise their statutory declaratory
judgment authority."  *Surefoot LC v. Sure Foot Corp.*, 531 F.3d 1236, 1240 (10th Cir. 2008).  These
factors include:

> (1) whether a declaratory action would settle the controversy; (2) whether it would
> serve a useful purpose in clarifying the legal relations at issue; (3) whether the
> declaratory remedy is being used merely for the purpose of "procedural fencing" or
> "to provide an arena for a race to res judicata; (4) whether use of a declaratory
> action would increase friction between our federal and state courts and improperly

encroach upon state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective.

*State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 983 (10th Cir. 1994).

Declaratory judgment is not warranted where it will "serve no useful purpose." *AmSouth Bank v. Dale*, 386 F.3d 763, 791 (6th Cir. 2004). Courts routinely refuse to enter a declaratory judgment where there is no distinction between that claim and other dispositive motions. *Transpac Marine, LLC v. Yachtinsure Servs., Inc.*, 655 F. Supp. 3d 18, 29 (D. Mass. 2023) (denying declaratory judgment where defendant advanced "the same legal and factual arguments regarding the voidability of [plaintiff']s insurance policy in support of its declaratory judgment claims, as it does in its motion for summary judgment"); *Scott v. Conley*, Case No. 15-CV-00371, 2016 WL 4257507, at *8 (D. Utah Jul. 18, 2016) ("When a declaratory judgment is duplicative of the substantive claims, it should be dismissed."); *Sensoria, LLC v. Kaweske*, No. 20-cv-00942, 2021 WL 1032020, at *15 (D. Colo. Jan. 12, 2021) ("A court may dismiss a declaratory judgment claim that is duplicative or redundant to other claims."); *Aqrawi v. Am. Mod. Prop. & Cas. Co.*, 555 F. Supp. 3d 467, 470 (S.D. Tex. 2021) (denying declaratory judgment where declaration request sought "resolution of matters that will already be resolved as part of the claims in the lawsuit" (internal citations and quotations omitted)).

Declining to enter redundant declaratory judgments aligns with the *Mhoon* factors. Where other motions will dispose of the controversy, there is an alternative remedy readily available and declaratory judgment will not settle the dispute nor serve a useful purpose in clarifying legal rights. In this case, Fisher argues that it is entitled to declaratory judgment for the "same reasons" it is entitled to summary judgment. Def.'s SJ Mot. at 13. Because the factual and legal theories undergirding these motions are identical, declaratory judgment is inappropriate. *Clearwater Enter. v. Leggett & Platt, Inc.*, No. CIV-23-46, 2023 WL 3397420, at *2 (W.D. Okla. May 11, 2023)

(explaining that many courts have dismissed claims for declaratory relief where "there is complete identity of factual and legal issues between the complaint and the counterclaim" (internal citations and quotations omitted)).  A declaratory judgment would merely reiterate that Fisher did not breach its contract with Malcolm and not serve a "useful purpose."  *Dale*, 386 F.3d at 791; *Jones v. Dep't of Air Force*, 947 F. Supp. 1507, 1515 (D. Colo. 1996) ("A declaratory judgment should not be entered unless it disposes of a controversy and serves a useful purpose.").  The Court therefore denies Fisher's motion for declaratory judgment, including its request for costs and attorney's fees.

CONCLUSION

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's motion for summary judgment on Plaintiff's claim for breach of contract is granted.

**IT IS FURTHER ORDERED** that Defendant's motion for declaratory judgment is denied.

_____

**SARAH M. DAVENPORT**
**UNITED STATES DISTRICT JUDGE**